GENERAL MOTORS CORPORATION,
Appellant,

v.

Mrs. Jay GRIZZLE, et al., Appellees.

No. 10–81–208–CV.

Court of Appeals of Texas,
Waco.

Nov. 18, 1982.

Rehearing Denied Dec. 9, 1982.

Royal H. Brin, Jr., R. Chris Harvey, Strasburger & Price, Dallas, for appellant.

Roger Knight, Jr., Roger Knight, Jr., Inc., Madisonville, Page Keeton and Steve McConnico, Scott, Douglass & Keeton, Austin, Fred Davis, Davis, Stacy, Lohmeyer & Davis, Bryan, Henry P. Giessel and Alice Giessel, Talbert, Giessel, Stone, Barker & Lyman, Houston, for appellees.

OPINION

CHASE, Justice.

This case involves a collision between a pickup truck and a 1976 GMC model vacuum truck. The vacuum truck was purchased a little over a year before the accident by Chem-Jet. Inc., a corporation in the business of renting vacuum and frat tank trucks, used in the production of oil and gas. Those involved in the accident were Donald Ray May, acting within the scope of his employment as a truck driver for Chem-Jet. Inc., who survived the accident with a broken nose; Charles David Grizzle, the driver of the pickup truck, and his daughter, Charlene Davette Grizzle, who were both killed in the collision and·his stepdaughter, Jaina Jeanette Wakefield, who was severely injured. Charlene and Jaina were riding in the cab of the pickup truck as passengers.

The record reflects it was a wet day on February 3, 1979, when Charles Grizzle was driving his pickup truck east on U.S. Highway 10 in Madison County. At the intersection of U.S. Highway 10 and Kurten Lane, the pickup truck was approached by two vehicles, a small Toyota truck and the Chem-Jet truck.

Donald May dropped two gears and applied the brakes when he saw the front Toyota vehicle slow down and signal a left turn to Kurten Lane. May felt the rear brakes lock and saw the rear of the truck slide into the left on-coming lane. Even though May struggled at the steering wheel to straighten up the truck, he lost control and the truck continued to cross back over to the left lane. Finally, the rear-end of the truck landed in the far left-hand ditch and the cab, angled toward the left lane, stopped on the shoulder. Within seconds, Charles Grizzle, unable to avoid the truck, crashed head-on.

Three suits, two negligence causes of actions against Donald May and Chem-Jet, Inc. and one products liability suit against General Motors Corporation (GMC), were

consolidated. The plaintiffs were Mrs. Jay Grizzle, mother of Charles Grizzle, with Jerry Grizzle, temporary administrator of Charles Grizzle's estate, Jane Patricia Grizzle, mother of Charlene Davette Grizzle, and Jaina Jeanette Wakefield.

Trial was to a jury which found that a design defect in the left rear brake assembly was a producing cause of the accident. It failed to find either Donald May negligent in driving or Chem-Jet, Inc. negligent in maintaining the GMC truck. The jury awarded Jane Patricia Grizzle $30,000.00 for the pecuniary loss resulting from the death of the minor daughter, Charlene; $20,000.00 for the loss of companionship and society resulting from the death of her daughter, and $40,000.00 for her own mental anguish which resulted from witnessing the injury of her daughter, Jaina Jeanette Wakefield. Mrs. Jay Grizzle was awarded $5,000.00 for the pecuniary loss resulting from the loss of her adult son and $50,000.00 for the loss of companionship and society of her son. Jaina Jeanette Wakefield was awarded $1,177,762.00 for her injuries which Appellant does not here appeal.

General Motors brings this appeal on twelve points of error.

Points of error 1 and 11 pertain to a "Mary Carter" agreement entered into, prior to trial, by Chem-Jet and May with Mrs. Jay Grizzle and Jerry Grizzle. The parties agreed that the co-defendants, would pay these plaintiffs $50,000.00 on the condition that they failed to recover at least $50,000.00 from General Motors.

Point of Error 1 concerns the disclosure of this agreement during the cross-examination of Donald May and T.O. Dunman, owner and president of Chem-Jet, Inc. Appellant asserts inquiries were necessary to elicit the co-defendants' financial interest and bias against GMC and to expose the non-adversary relationship between the plaintiffs and co-defendants. Appellant relies on *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977), where the Supreme Court held the exclusion of a Mary Carter agreement was reversible error.

Commenting on the trial court's indiscretion in preventing General Motors from inquiring into any terms of the Mary Carter agreement, the Supreme Court concluded:

The financial interest of parties and witnesses in the success of a party is a proper subject of disclosure by direct evidence or cross examination. While the alignment of the adversaries was disclosed, the jury did not know the extent of Feld's interest or that it was a financial interest which depended upon the amount of the judgment for Simmons.

In *Simmons,* the gravamen of the decision is that the nature of the agreement was withheld from the jury. Although Simmons approves of cross-examining a party-witness to ascertain the witness' interest in the outcome of the suit, it does not crown cross-examination as the only viable trial tactic that can expose a Mary Carter agreement. The Supreme Court held the jury could be informed of the agreement by direct evidence as well as cross-examination.

In the instant case, the co-defendants chose to inform the jury by direct evidence. Chem-Jet introduced the "Mary Carter" agreement into evidence during the cross-examination of Mrs. Jay Grizzle, whom General Motors declined to cross-examine. However, during the subsequent testimonies of T.O. Dunman and Donald May, General Motors attempted to ascertain their understanding of the agreement on cross-examination. The trial court sustained the co-defendant's objection of immateriality since the Mary Carter agreement was already admitted into evidence.

General Motors was permitted to convey the co-defendants' financial interest in imputing all the fault of General Motors throughout the trial. At voir dire, GMC stated:

The agreement guarantees the plaintiffs $50,000.00. But if the plaintiffs get as much as that from GMC, Chem-Jet gets its money back. So I want you to keep that in mind, Chem-Jet has a direct financial interest in helping the plaintiffs.

General Motors dwelled on the agreement in its opening argument and re-emphasized the nature of the settlement in its closing argument and instructed the jury to carefully read the document.

 The jury had in its hands the terms of the agreement that defined the nature of the agreement and the position of the parties. The agreement was, on its face, a complete, unambiguous contract, and parol evidence, in the absence of fraud, accident or mistake, is inadmissible. *Armstreet v. Greer,* 411 S.W.2d 403 (Tex.Civ. App.—Tyler 1967, writ ref'd n.r.e.). The trial court only prohibited Appellant from attempting to substitute the co-defendants' understanding of the agreement for the agreement itself. Considering the jury had direct evidence of the agreement and listened to appellant's interpretation of the agreement throughout the trial, we conclude the proffered testimony of the co-defendants' understanding of the agreement was properly refused. Point of Error 1 is overruled.

Point of Error 11 contends the $55,000.00 jury award to Mrs. Jay Grizzle should be set-off by the $50,000.00 guarantee that Chem-Jet and May agreed to pay pursuant to the terms of the Mary Carter agreement.

 A non-settling defendant is entitled to a credit of the amount that is paid by a settling tort feasor in compensation for the plaintiff's claim of injury. *Schering Corp. v. Giesecke,* 589 S.W.2d 516 (Tex.Civ. App.—Eastland, 1979, no writ). The principle behind a credit allowance is the "one satisfaction rule"; a plaintiff is entitled to only one satisfaction for an injury. *McMullen v. Coleman,* 135 S.W.2d 776 (Tex.Civ. App.—Waco 1940, no writ). The rule serves no purpose if the essential premise, a payment of money, is not performed because there is no threat of a double recovery.

In the instant case, the record reveals no evidence of any payment made to the plaintiffs by the co-defendants. The agreement expressly reads that Chem-Jet and May's payment is contingent upon a judgment "that has become final" which confirms that General Motors will pay Mrs. Jay Grizzle and Charles Grizzle's estate less than $50,000.00. Then and only then will Chem-Jet and May pay the difference up to $50,000.00.

 General Motors now asks the court for credit of a presently unascertainable amount. This credit would result in a deduction of Mrs. Jay Grizzle's single recovery. The one-satisfaction rule mandates a full satisfaction, not more and not less. Point of Error 11 is overruled.

Point of Error 2 contests General Motors' liability of the accident. In particular, GMC contends there was no evidence or insufficient evidence to support the judgment based upon the jury finding that a defective brake design was a producing cause of the accident.

 In cases involving strict liability for defective design, liability is determined by the product's defective condition, considering the utility and risk of the product and the feasibility of safer alternatives. *Boatland of Houston v. Bailey,* 609 S.W.2d 743 (Tex.1980).

 The evidence shows Chem-Jet purchased the 1976 GMC truck near the end of 1977 for the use of water transportation in the production of oil and gas. The GMC truck was equipped with an air brake system that operated by compressed air pushing against a piston and causing an S–Cam to rotate with a shaft adjuster; this rotation prompted the brake shoe to expand and reach the drum. The truck was also equipped with an anti-skid device which was to prevent the brakes from locking by releasing and reapplying air which consequently would reduce the brake force on the S–Cam.

May testified he lost control of the truck when the lower brake shoe on the left rear wheel locked. Upon examination following the accident, the left rear brake shoe was found in a hung position against the casting.

Two expert witnesses testified the left brake was defective in several particulars in

design and such defects could have been remedied at little cost to prevent the accident. Dr. Whipple, a specialist in failure analysis, testified a worn pin and shoe allowed unusual lateral movement in the lower brake shoe. This lateral movement was the principal culprit of the brake failure because it allowed the brake shoe to become wedged between the casting and the brake drum. With the shoe unable to return to its normal position, the anti-skid device could not release the braking force. Plaintiff's other expert agreed with Dr. Whipple that the brake design, allowing this lateral movement, was unreasonably dangerous. Both experts testified that simply a larger guide plate would feasibly guard against the abnormal lateral movement. General Motors had the technology to increase the size of the plate at the time the brake was designed. Both experts concluded that the locked brake shoe caused the accident.

Reviewing the evidence in its most favorable light, together with the supporting inferences, and disregarding the contrary evidence, we hold there was more than a scintilla of evidence for the jury to find a design defect in the brake as a producing cause of the accident.

█ General Motors attempted to explain the accident in several ways. First, their expert denied that the lateral movement could cause the brakes to lock or that the brakes were locked at the time of the accident. (At trial, plaintiffs produced the expert's deposition that read the expert had never seen pins worn as badly or brake shoes displaced as much as the brake system in the GMC truck. The expert at deposition admitted the brake system could be a hazard, yet refused to admit the existence of the hazard at trial.) General Motors argued that the truck driver was negligent in losing control of the vehicle. GMC stressed the truck driver's testimony conflicted with the appellee's own expert witnesses in regards to the direction the truck veered when he applied the brakes.

Considering all the evidence, we do not find the jury's finding of fact to be so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. Point of Error 2 is overruled.

Points of Error 4, 6 and 12 challenge the damages awarded to Jane Patricia Grizzle and Mrs. Jay Grizzle. Point of Error 4 asserts the trial court erred in awarding damages for the loss of companionship and society of Jane Grizzle's minor daughter and Mrs. Jay Grizzle's adult son.

█ Damages awarded surviving parents in the wrongful death of a minor child must be based on the pecuniary value of the minor child's services until he reaches majority and such sums as might reasonably be expected as contributions after the child reaches majority, minus the cost and expense of the child's care, support, education, and maintenance. *Bedgood v. Madalin*, 600 S.W.2d 773, 775 (Tex.1980). In the wrongful death action of an adult child, a parent may recover the pecuniary loss actually sustained by the parent. *Borak v. Bridge*, 524 S.W.2d 773, 776 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.). Texas law still does not recognize a recovery for the loss of companionship of a child whether he be an adult or a minor. *Bedgood*, supra. Appellant's fourth point of error is sustained and the recovery of Jane Grizzle and Mrs. Jay Grizzle is reformed so that they receive nothing for the loss of companionship and society of their children.

Point of Error 6 contends the trial court erred in awarding Jane Grizzle $40,000.00 for her mental anguish in witnessing the injury of her daughter, Jaina Jeanette Wakefield.

Jane Grizzle and her son were traveling in a separate vehicle a few minutes behind Charles Grizzle's truck. They came upon the accident before the arrival of any police, ambulance, or wrecker. As Jane parked her car and ran closer toward the crashed vehicles, she could clearly perceive the results of the accident. She began to scream and fainted, hitting her head on the road. When she regained consciousness, she attempted to go to the collision because she heard her daughter screaming and saw

her coat smashed against the truck window; but her son held her back and persuaded her to go to the hospital. There, she waited as Jaina underwent emergency surgery from 2:00 in the afternoon to 12:30 at night.

Appellant contends Jane Grizzle could not recover for her mental injury because she neither saw, heard, or otherwise sensorily perceived the accident. Texas courts allow a bystander to recover from mental anguish when a defendant should have reasonably foreseen plaintiff's injury. Texas, following the *Dillon v. Legg* doctrine, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), considers three factors in ascertaining foreseeability:

 (1) whether the plaintiff was located near the scene of the accident;

 (2) whether the shock resulted from a direct emotional impact upon the plaintiff from a contemporaneous perception of the accident; and

 (3) whether the plaintiff and the victim were closely related.

*Landreth v. Reed,* 570 S.W.2d 486 (Tex.Civ. App.—Texarkana 1978 no writ). The first two factors require a relatively close connection in both geography and time between the accident and the resulting injury. Courts have denied recovery if the plaintiff is told of the accident at a later time instead of witnessing the event. However, the triggering of the mental anguish is not from only perceiving a collision, but from the realization of its consequences.

In *Bedgood v. Madalin,* 589 S.W.2d 797 (Tex.Civ.App.—Dallas 1979), reversed and remanded on other grounds, 600 S.W.2d 773 (Tex.1980), the appellate court awarded a bystander parent recovery for his mental anguish although he only heard the impact of an auto striking his son. The court had no difficulty with the fact that the father did not visually witness the accident because he heard it and then witnessed the results soon thereafter. The court recognized that it is the observation of the consequence of the negligent act, and not just the act itself that is likely to cause trauma so severe as to result in mental injury. The realization of the consequences can be pro-

duced from the moans and cries of the victim at the accident as well as from actual observation of the victim.

A mother may witness a violent collision in which her child is involved, but if the child emerges unharmed, there is no sensory perception and no mental injury.

On the other hand, if the mother arrives at the collision moments after it happened and witnesses the child trapped in the car, bleeding and crying, the sensory perception comes about and the mental injury takes place.

The evidence shows the mother came upon the accident moments after the collision. She witnessed the pickup truck totally crammed against the Chem-Jet truck. Horrified, she immediately ran to the scene and fainted, to regain consciousness to the grievous cries of her daughter. Jane Grizzle was brought so close to the reality of the accident as to render her experience an integral part of it. *Landreth v. Reed,* supra. Point of Error 6 is overruled.

Point of Error 12 asserts the trial court erred in awarding pecuniary damages to Mrs. Jay Grizzle for the death of Charles Grizzle because the award represented a $41,000.00 debt that Charles owed his mother. The jury awarded Mrs. Jay Grizzle $5,000.00 in answer to the following special issue:

 What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly compensate Mrs. Jay Grizzle (sic) for her pecuniary loss, if any, resulting in the death of Charles Grizzle?

Plaintiff admitted into evidence three promissory notes, that established Charles owed his mother the sum amount of $41,000.00. Appellant now contends the $5,000.00 award represents this indebtedness and is not a proper element of recovery in a death action because the indebtedness was a legal obligation to pay his mother.

In an action by a parent for the death of an adult child, a mother can recov-

er only the present value of an amount she proves the child would probably have contributed to her support, had he lived. *Peek v. Parker,* 210 S.W.2d 619 (Tex.Civ.App.— Fort Worth 1948, no writ). Although this measure of damages is called "pecuniary loss", it concerns the pecuniary benefits, in the form of voluntary contributions, that the deceased adult would have contributed. *Dixon v. Samartino,* 163 S.W.2d 739 (Tex. Civ.App.—Galveston 1949, writ ref'd w.o.m.)

▮ Since "pecuniary loss" pertains to contributions that a parent has no legal right to take from the adult child's earnings, the $41,000.00 debt Charles owed his mother is not a proper element of recovery. Pecuniary benefits encompass those benefits that can be reasonably estimated in money, such as labor, services, advice and counsel and attention in ministering to the wants and needs of parents. *Borak v. Bridge,* supra.

▮ These damages are not susceptible of exact proof and the amount is left largely to the sound discretion and common sense of the jury. The appellate court will not disturb the jury's finding where it is the result of an honest endeavor to ascertain the damage sustained in the light of the attendant facts and conditions.

▮ In the instant case, the evidence showed Mrs. Jay Grizzle was a seventy year-old widow. She had worked with her husband in establishing their family auto parts business. Charles was her first son. After he graduated from Sam Houston University, he returned home to work. Charles was a very dependable son who helped take care of her business and finances as well as her ordinary daily needs. The $39,000.00 difference between the jury award and Charles's debt manifests the little, if at all, effect these debts had upon the jury in their deliberation of Mrs. Jay Grizzles's pecuniary loss.

Upon these facts, in the absence of a showing of some improper motive or some passion or prejudice on the part of the jury in arriving at its verdict, the judgment of the trial court is binding upon the court and must be affirmed. Point of Error 12 is overruled.

Points of Error 7 through 10 attack the trial court's refusal to grant a new trial due to improper and incurable jury arguments. Appellant contends the plaintiffs carried on a concerted campaign of appeals to the sympathies and prejudices of the jury.

In *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979), the Supreme Court set forth the burden of proof that a complaint must carry to reverse a case due to improper jury arguments. A complainant "has the burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. . . . (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence."

▮ Appellant has failed to carry this burden. In particular, Point of Error 9 complains Attorney Davis, counsel for plaintiffs Jane Grizzle and Jaina Wakefield, improperly argued as to General Motors' failure to call a witness who was equally available to both parties. Courts have held the argument concerning an opponent's failure to produce a witness as improper, but curable. *American Home Assurance Co. v. Coronado,* 628 S.W.2d 818 (Tex.App.

—Amarillo 1981, writ ref'd n.r.e.). Appellant failed to request an instruction to disregard the argument and waived the error. *Otis Elevator Co. v. Wood,* 436 S.W.2d 324 (Tex.1968).

Point of Error 8 asserts Attorney Knight, counsel for Mrs. Jay Grizzle, improperly injected his personal relationship with the deceased and their family throughout the trial. Knight was a friend of Charles Grizzle since childhood. During voir dire, Knight expressed his personal feelings for the deceased several times, yet Appellant objected only once and was overruled. Appellant preserved its right to question the discourse when it timely objected. While questioning a venireman, Knight proceeded:

> Mr. Knight: ... In this case, it's particularly disheartening to me because Charles and I grew up together and we played on the first Little League team Madisonville ever had and played football together in Jr. High and football in High School and played basketball together, and I spent time in their home and he spent time in my home.

During the trial proper, Appellant made an objection to the attorney's further references to his friendship and was sustained. But again Appellant failed to request an instruction to disregard and waived the error.

On closing argument Knight continued to refer to his association with the deceased as follows:

> Mr. Knight: May it please this Honorable and Learned Court, I rise to speak for my dead friend Charles Grizzle.
>
> Mr. Harvey: Your Honor, we are going to object to Mr. Knight's continued reference to his personal relationship and personal feelings in this matter. It's highly prejudicial and irrelevant.
>
> By The Court: Overruled.
>
> Mr. Harvey: We ask the Court to instruct the jury to disregard his statement.
>
> By The Court: Overruled.
>
> Mr. Harvey: Your Honor, may we have a continuing objection on that basis, so we don't have to interrupt him?

> By The Court: Only on that part. Go ahead.
>
> Mr. Knight: I have never tried a case where I had probably close—a personal relationship involved as I do in this case, and for that reason I probably get somewhat emotional about it and I probably get somewhat wrought about it and I probably get bent out of shape about it, but that's the way I feel. There are certain things that are certain in this case that nobody controverts and nobody argues. We have lost two people in our community who lived among us, participated among us, athletics in school, church activities, and were an intricate part of our community ... I resent in this case a lot of things. I resent that my friend, Charles Grizzle and I can't sit down and share times of boyhood and what happened to us when we were kids, over a cup of coffee.

Counsel's personal relationship with the plaintiffs and the deceased were matters extrinsic to the issues of the case and improper. However, since the topic was irrelevant to any issue of the case, we fail to find a harmful effect to any material finding. Point of Error 10 complains of Knight's appeal to the jury's local prejudices during closing arguments. Appellant had a running objection to counsel's argument concerning his personal relations with the parties. Such objections did not cover any other topic. By failing to give a timely objection Appellant waived the errors. Although such discussions are improper, they can be cured by an objection and instruction to the jury to disregard.

Point of Error 7 contends the cumulative effect of all the statements was so prejudicial that instructions from the court could not have cured the harm. There are only rare instances of incurable harm from improper arguments. The Supreme Court has recognized only three types of inflammatory incurable arguments:

(1) an appeal to racial prejudice;

(2) the use of epithets of "liar," "fraud," "faker," "cheat," and "impostor" in disregard of objections that were made; and

(3) an unsupported charge of perjury.

*Standard Fire Insurance Co. v. Reese,* supra. None of the arguments Appellant complains of are so prejudicial to require a reversal in themselves. Furthermore, in reviewing the whole record, the state of the evidence, the strengths and weaknesses of the case and the verdict, we do not find that the cumulative effect of these arguments are sufficiently prejudicial to mandate a reversal. We conclude the jury carefully considered the evidence and would have reached its same conclusions from the evidence without regard to the counsel's arguments. Points of Error 7 through 10 are overruled.

The judgment of the trial court is reformed to exclude damages for loss of companionship and society, and as reformed is affirmed.

McDONALD, C.J., not participating.